**Affirmed and Memorandum Opinion filed November 30, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-14-00755-CV

---

### KELLEY STREET ASSOCIATES, LLC, Appellant

### V.

### UNITED FIRE AND CASUALTY COMPANY, Appellee

---

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2013-36796A**

---

## M E M O R A N D U M    O P I N I O N

Kelley Street Associates, LLC appeals an order denying its motion for partial summary judgment and an order granting United Fire and Casualty Company's counter-motion for final summary judgment. Kelley argues that the trial court erred in granting summary judgment in favor of United Fire and in denying its motion for partial summary judgment because United Fire's insurance policy provides coverage for the loss Kelley incurred in this case. We affirm.

## BACKGROUND

Kelley owns a building on 5825 Kelley Street in Houston, Texas. The building flooded after City of Houston employees repaired a water meter and valves on the street in front of the building on October 2, 2012. The flooding damaged the building, its fixtures, and its contents.

Kelley reported a claim on October 3, 2012, under an insurance policy issued by United Fire. The claim was denied on October 8, 2012, after United Fire determined that the property damage did not constitute a "covered cause of loss" under the insurance policy. United Fire later paid Kelley $50,000 under the insurance policy's endorsement for "sewer backup coverage."

Kelley sued United Fire and alleged that "[b]y failing to make payment of [Kelley's] valid claim in full, United Fire has violated the prompt payment provisions of the Texas Insurance Code, including TEX. INS. CODE §542.058(a), which requires payment of claims within sixty (60) days after information necessary to process the claim has been provided." Kelley sought attorney's fees under section 542.060 of the Texas Insurance Code and section 38.001 of the Texas Civil Practice and Remedies Code. Kelley also sued the City of Houston seeking damages in connection with the water meter and valve repairs to which Kelley attributed the flooding.

Kelley filed a motion for partial summary judgment "on the issue of coverage under a commercial property insurance policy." Kelley specifically stated that the "amount of [its] loss, its attorney's fees, and its damages under the Unfair Claim Settlement Practices Act, TEX. INS. CODE §542.0001 et seq. remain to be established. However, there is no genuine issue as to coverage of [its] loss under United Fire's insurance policy."

Kelley contended that City of Houston employees dislodged debris while repairing the water meters and valves in front of Kelley's building, and that this

2

debris entered the water main connected to Kelley's building. According to Kelley, this debris traveled through the water main; entered Kelley's building; and damaged flush valves in the building's toilets, which caused holding tanks in the building's septic system to fill rapidly. As a result, Kelley contended that water from the septic system came up through floor drains inside the building and flooded it. Kelley further asserted that United Fire denied the claim "relying on a policy exclusion for losses caused by '[w]ater that backs up or overflows from a sewer, drain, sump, sump pump or related equipment.'"

Kelley argued that the damage was a covered loss under United Fire's policy as a matter of law, and that United Fire invoked an inapplicable exclusion when it denied Kelley's claim. According to Kelley, the exclusion for losses caused by "[w]ater that backs up or overflows from a sewer, drain, sump pump or related equipment" applies when a municipal sewer system fails and overflows; under Kelley's reading of the policy, this exclusion does not apply here because the "loss was not caused by any backup or overflow of water from the City's sewer, drain or sump, which continued to function properly." Kelley also argued that the policy exclusion does not apply when the insured's plumbing system fails. Kelley contended that the "'sewer, drain or sump' referred to in the Exclusion is not part of the insured's plumbing system. . . . Therefore, where there is no evidence of a blockage in a sewer line located off of the insured's premises, the Exclusion does not apply."

In its summary judgment response and counter-motion for summary judgment, United Fire argued that Kelley's damages and loss were directly caused by "the building's septic system [being] overrun and flood[ing] the building through its floor drains." United Fire further argued that the policy unambiguously excludes any loss or damage caused directly or indirectly by water that backs up or overflows from a

3

sewer, drain, or sump. According to United Fire, the plain meaning of the term "drain" includes floor drains, and the plain meaning of the term "sewer" includes septic systems.

Kelley filed a combined reply in support of its motion for partial summary judgment and response to United Fire's counter-motion for summary judgment, in which it contended that the "Water Exclusion Endorsement" describes "an overflow of water originating *outside* the insured's plumbing system." Kelley argued that a separate "Water Damage Coverage Provision" establishes "additional coverage for certain water damage" and "describes an overflow caused by a malfunction inside the insured's plumbing system." Therefore, according to Kelley, "the Exclusion applies to an overflow that originates outside the insured's plumbing system . . . — that is, to water that backs up or overflows from a sewer, drain or sump located off of the insured's premises, such as a municipality's sanitary sewer or storm drain." Under Kelley's view, a reasonable policy interpretation dictates that "damages caused by an internal plumbing problem — as in this case, where water introduced from the water main overfills the insured's septic tank due to damaged flush valves, causing water to come up through floor drains — is not covered by the Exclusion." This interpretation means the loss is covered because the overflow of water did not originate outside Kelley's building's plumbing system and the exclusion is inapplicable. Kelley additionally argued that the term "sewer" cannot reasonably be interpreted to encompass a septic tank and the term "drain" cannot reasonably be interpreted to encompass a floor drain. Therefore, Kelley contended that the exclusion United Fire relied on "cannot be reasonably interpreted to include water that backs up or overflows from a floor drain," or "water that backs up or overflows from a septic tank."

United Fire filed a combined reply and sur-reply in which it argued that the

4

exclusion is unambiguous and is not limited to overflow that originates outside the insured's plumbing system.

On May 9, 2014, the trial court signed an order denying Kelley's motion for partial summary judgment and an order granting United Fire's motion for final summary judgment. On June 25, 2014, the trial court signed an order granting United Fire's motion (1) to sever Kelley's claims against the City of Houston; and (2) for entry of final judgment regarding Kelley's claims against United Fire. Kelley timely appealed.

ANALYSIS

## I.     Governing Standards

Kelley contends that the trial court should have granted its motion for partial summary judgment and denied United Fire's motion for summary judgment because the "insurance policy exclusion for losses caused by '[w]ater that backs up or overflows from a sewer, drain, sump pump or related equipment' [does not] exclude[] losses resulting from a water overflow from the septic system in the insured's building caused by accidental damage to the insured's plumbing system."

A traditional summary judgment is proper under Texas Rule of Civil Procedure 166a(c) when the movant establishes the absence of any genuine issue of material fact such that the movant is entitled to judgment as a matter of law. *See* Tex. R. Civ. P.166a(c); *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005). We review the trial court's grant of summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In so doing, we examine the record in the light most favorable to the non-movant by indulging every reasonable inference in the non-movant's favor and resolving any doubts against the grant of summary judgment. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their

5

conclusions in light of all of the summary judgment evidence. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

Although Kelley did not seek a final judgment, we may review the trial court's denial of Kelley's partial summary judgment motion because Kelley and United Fire each sought summary judgment on the same issue. *See Frontier Logistics, L.P. v. Nat'l Prop. Holdings, L.P.*, 417 S.W.3d 656, 659, 664 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). When both parties move for summary judgment, each party must carry its own burden; neither can prevail because the other failed to discharge its burden. *Id*. at 659. Therefore, Kelley and United Fire each bore the burden to establish entitlement to a summary judgment as a matter of law. *See id*.

We analyze insurance contracts according to well-established principles of contract construction. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010). In determining the scope of a policy's coverage, "[o]ur primary goal is to determine the contracting parties' intent through the policy's written language." *See id*. We must read all parts of the contract together, giving effect to each word, clause, and sentence, and avoid making any provision within the policy inoperative. *Id*. Our analysis of a policy is confined within the four corners of the policy itself. *Id*. The policy's terms are given their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical or different sense. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). When an insurance policy defines its terms, those definitions control. *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 381 (Tex. 2012).

Courts strive to honor the parties' agreement and avoid reading additional provisions into it that would remake the contract. *Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 126. Whether a particular provision or the interaction among multiple provisions creates an ambiguity is a question of law. *Page*, 315 S.W.3d at 527. If

policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and we construe it as a matter of law. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). The fact that the parties may disagree about a policy's meaning does not create an ambiguity. *Page*, 315 S.W.3d at 527. Only if a policy is subject to two or more reasonable interpretations may it be considered ambiguous. *Id*.

## II.      Governing Policy Language

The parties' competing arguments must be weighed in light of the governing policy language, which is set forth below.

### A.      Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

. . . .

### CAUSES OF LOSS — SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.**, Definitions.

### A.      Covered Causes Of Loss

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

1.      Excluded in Section **B.**, Exclusions; or

2.      Limited in Section **C.**, Limitations; that follow.

### B.      Exclusions

1.      We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

. . . .

g.      **Water**

(1)      Flood, surface water, waves, tides, tidal waves,

7

overflow of any body of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows from a sewer, drain or sump; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not;

or

**(c)** Doors, windows or other openings.

But if Water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

. . . .

## G.    Definitions

. . . .

**2.**    "Specified causes of loss" means the following:   fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

. . . .

**c.**    Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

The parties agree that the Water Exclusion under Causes of Loss — Special Form section B.1.g. quoted above is modified and replaced by the following Water

Exclusion Endorsement:

## WATER EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART STANDARD PROPERTY POLICY

**A.** The exclusion in Paragraph **B.** replaces the **Water** Exclusion in this Coverage Part or Policy.

**B.** **Water**

1. Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

2. Mudslide or mudflow;

3. Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

4. Water under the ground surface pressing on, or flowing or seeping through:

   a. Foundations, walls, floors or paved surfaces;

   b. Basements, whether paved or not; or

   c. Doors, windows or other openings; or

5. Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1.**, **3.** or **4.**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **1.** through **5.**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **1.** through **5.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

We now turn to the parties' arguments concerning the correct interpretation of this policy.

## III.    Application of Standards to Policy Language

Kelley argues that the Water Exclusion Endorsement does not bar coverage here because the exclusion "describes an overflow of water originating outside the insured's plumbing system.  Conversely, the [policy] provision for additional water coverage describes an overflow caused by a malfunction inside the insured's plumbing system."  Kelley argues that, "[f]airly read, these provisions mean that an overflow from an act of nature or other event outside of the insured property will not be covered under the Policy, while losses caused by an accident within the plumbing system of the property will be covered."

According to Kelley, it is "a reasonable interpretation that the exclusion does not reach losses caused by an internal plumbing problem — as in this case, where the insured's septic system backs up due to damaged flush valves, causing water to come up through floor drains.  Such an overflow of water did not originate outside Kelley['s] . . . plumbing system and did not come from a sewer, drain or sump."  Kelley further argues that the exclusion is inapplicable because the water entered Kelley's building through floor drains and backed up from the septic system.  Under Kelley's reading, the term "drain" listed in the exclusion does not encompass floor drains, and the term "sewer" listed in the exclusion does not encompass a septic system.

We reject Kelley's contentions because (1) the unambiguous Water Exclusion Endorsement's reach is not limited to losses caused by an event "outside the insured's property;" and (2) the term "drain" listed in the exclusion includes floor drains.

The Water Exclusion Endorsement unambiguously states that United Fire "will not pay for loss or damage caused directly or indirectly by . . . [w]ater that backs up

or overflows or is otherwise discharged from a sewer, drain . . . ." The exclusion focuses on the type of water-related loss – not on whether the water-related loss originates inside or outside the insured's property. Nothing in the exclusion's language supports Kelley's assertion that the exclusion "describes an overflow of water originating outside the insured's plumbing system" and that the "exclusion does not reach losses caused by an internal plumbing problem — as in this case."

It would be improper to rely on Kelley's proposed external-versus-internal distinction because doing so impermissibly would read additional language into the policy. *See RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 124 (Tex. 2015) ("we cannot add words to the policy's language"); *Nat'l Union Fire Ins. Co. v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008) ("Most importantly, we must give the policy's words their plain meaning, without inserting additional provisions into the contract."); *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) ("But we may neither rewrite the parties' contract nor add to its language.").

If the parties had intended to differentiate in the Water Exclusion Endorsement between water-related losses that originate outside the insured's property and those that originate inside, then the parties could have included language in this provision reflecting this intent. *See Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). The parties did not do so and reading such a distinction into this provision would be tantamount to rewriting the policy – a step we cannot undertake. *See id*.

This conclusion is underscored by other policy provisions that expressly describe coverage or exclusions based on whether a loss's origin is internal or external to the insured's property. To list only a few examples, the policy provides in Causes of Loss — Special Form as follows:

- In section B. Exclusions: "We will not pay for loss or damage caused directly

11

or indirectly by . . . [t]he failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure: **(1)** Originates away from the described premises; or **(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises." *See* B.1.e.

- In section C. Limitations: "We will not pay for loss of . . . property, as described and limited in this section . . . **a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. . . . **b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion." *See* C.1.a., b.

- In section D. Additional Coverage — Collapse: "The coverage provided under this Additional Coverage — Collapse applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.** . . . **5.** If personal property abruptly falls down or caves in . . . , we will pay for loss or damage to Covered Property caused by such collapse of personal property only if: . . . **b.** The personal property which collapses is inside a building . . . ." *See* D.5.b.

- In Section G. Definitions: "'Specified causes of loss' means . . . falling objects . . . **b.** Falling objects does not include loss or damage to: **(1)** Personal property in the open; or **(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object." *See* G.2.b.

The presence of an express distinction between interior and exterior locations in other policy provisions confirms that the omission of such a distinction in the Water Exclusion Endorsement was purposeful.

We also reject Kelley's contention that applying the Water Exclusion Endorsement to "events originating outside the insured property and to internal plumbing malfunctions" would render meaningless the coverage for water damage provided under section F.2[1] and "water damage as a specified cause of loss" provided under section G.2. in the Causes of Loss — Special Form.

Kelley argues that the coverage for "water damage" would be rendered meaningless because the "loss described in the coverage extension would always be excluded by the Water Exclusion Endorsement" and "water damage in all cases would be excluded under the Policy." This argument fails because it is unnecessary to make an internal-versus-external distinction for sections F.2. and G.2 to have meaning. Water damage caused by internal plumbing mishaps would not "always" be excluded. Some types of damages from internal plumbing mishaps — such as those based on a broken pipe — would not be excluded by the Water Exclusion Endorsement; other types of damage from internal plumbing mishaps — such as those based on water backing up or overflowing from a sewer or drain — would be excluded by the Water Exclusion Endorsement. Contrary to Kelley's assertion, the Water Exclusion Endorsement's reach does not depend on whether water-related losses originate inside or outside the building. Rather, the Water Exclusion Endorsement's reach depends on the type of water loss at issue.

We are also unpersuaded by Kelley's assertion that "case law supports a construction that distinguishes between an overflow from a municipal water or sewer system, which is covered by similar exclusions, and an overflow from the insured's own holding tanks or septic system caused by an accident occurring within the

---

[1] Section F.2. provides "Additional Coverage Extensions" for water damage: "If loss or damage caused by or resulting from covered water . . . damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes."

13

insured's plumbing system, which is not covered by the exclusion."

Kelley primarily relies on *For Kids Only Child Development Center, Inc. v. Philadelphia Indemnity Insurance Co.*, 260 S.W.3d 652 (Tex. App.—Dallas 2008, pet. denied), to support its argument that "provisions such as the exclusion cited by United Fire are intended to apply when a *municipal sewer system* fails and overflows." Kelley contends that "[w]hat is significant about this analysis is the [*For Kids Only*] court's focus on the source of the overflow — that is, the municipal sewage system and not a plumbing accident on the insured's premises. Since the source of the overflow was the municipal water system, the exclusion was held to apply although the water flowed through the insured's plumbing system."

*For Kids Only* does not support Kelley's argument. In that case, a day care center was flooded with sewage flowing from floor drains in the building; the overflow was caused by stoppage in a twelve-inch city sewer main. *Id*. at 653. The day care's insurance policy excluded from coverage loss or damage caused directly or indirectly by water that backs up or overflows from a sewer, drain or sump. *Id*. The insurer nonetheless paid the day care center $25,000 under a special endorsement. *Id*. at 653-54. A dispute arose regarding the extent and amount of coverage the insurance policy afforded. *Id*. at 654.

The insurer claimed that the sewage overflow was subject to the sewer and drain backup exclusion in the main policy, and that the day care center had been paid all that was due under the policy. *Id*. The day care center characterized the sewage overflow event as an accidental "overflow from its plumbing system that does not trigger the sewer and drain backup exclusion." *Id*. 654-55. It argued that the policy "provides 'all risk' coverage subject to specific exclusions" and "plumbing overflow is not one of the specified exclusions," so that "it should be able to access the main insurance policy's higher limits for covered losses." *Id*. at 655. The day care center

14

cited "surface water cases as revealing that once water enters a building's plumbing system, its status changes and any damage it causes becomes a plumbing mishap which is not excluded under [the day care center]'s policy." *Id*.

The court did not find the surface water cases to be persuasive "in light of the clear language in the insurance policy at issue" and rejected the day care center's argument. *Id*. The court stated that the policy excluded coverage for water that backs up or overflows from a sewer, drain, or sump; and "[r]eading the exclusion so as to eliminate instances where water has traveled through [the day care center]'s plumbing system would, in effect, be reading the exclusion out of the policy." *Id*. The court concluded that the policy unambiguously excluded from coverage the type of drain and sewer back up the day care center experienced. *Id*. at 656.

Nothing in *For Kids Only* supports Kelley's contention that the court focused on "the source of the overflow — that is, the municipal sewage system and not a plumbing accident on the insured's premises. Since the source of the overflow was the municipal water system, the exclusion was held to apply although the water flowed through the insured's plumbing system." Nor does *For Kids Only* support Kelley's argument that "provisions such as the exclusion cited by United Fire are intended to apply when a *municipal sewer system* fails and overflows."

Kelley also cites *Jackson v. American Mutual Fire Insurance Co.*, 299 F. Supp. 151 (M.D.N.C. 1968), *aff'd*, 410 F.2d 395 (4th Cir. 1969), contending that in that case "the exclusion was found to apply because the insured's loss was caused by an overflow from the city's sewer or water lines." In *Jackson*, after sewage from the municipal sewerage system backed up into the insured's house through her private sewer line, sewage began overflowing from commodes and other fixtures in the home's bathroom and seriously damaged her property. *Id*. at 153-54. The policy insured against loss to property covered by the "following perils as defined and

15

limited therein . . . 15. Accidental discharge, leakage or overflow of water or steam from within a plumbing . . . system." *Id*. at 152. The policy also contained a special exclusion for water which backs up through sewers or drains. *Id*. at 152-53.

The court stated that the insured's loss clearly fell within the special exclusion because the loss resulted from water backing up in the city's sewer lines until it reached the insured's service line, causing water and sewage to overflow into the insured's home. *Id*. at 156. The court also stated that the insured "cannot recover under insuring clause number 15 unless there exists an irreconcilable conflict between the clause and the exclusion clause." *Id*. The court concluded that there was no conflict between the insuring clause and the exclusion:

> The insuring clause insures generally against loss caused by the accidental discharge or overflow of water from within the plumbing system. Without the 'special exclusions,' this clause would insure against any loss caused by such overflow from within the plumbing system. However, the provisions under clause (b) of the special exclusions limits this coverage by excepting overflow caused by certain outside forces. Clause (b)(2), unfortunately for the [insured], excepts any loss resulting from 'water which backs up through sewers or drains.' This must refer to sewers or drains outside the [insured]'s plumbing system, that is, the sewers or drains in the sewer system of the [city]. This interpretation is reinforced by the fact that all of the other exceptions under clause (b) except loss caused by forces outside the [insured]'s plumbing system.
>
> The insuring clause would cover any accidental discharge or overflow of water from within the plumbing system resulting from defects in the plumbing system such as a pipe within the system clogging thereby causing the pipe to fill and overflow. The insuring clause would also cover any other such discharge or overflow resulting from any cause not specifically excepted under the 'Special Exclusions.' Therefore, the exception merely carves out of the general class of contingencies covered certain types of losses to be excepted and there is no conflict between the two clauses.

*Id*.

16

Kelley misplaces its reliance on *Jackson*. The insuring clause at issue in *Jackson* varies from the provision Kelley points to in section G.2.c. of the policy to support its contention that we should read the policy language at issue as differentiating between internal and external plumbing mishaps. In any event, and as discussed above, Texas law does not allow us to read new additional language into a contract and thereby rewrite the parties' contract. *See RSUI Indem. Co.*, 466 S.W.3d at 124; *Crocker*, 246 S.W.3d at 606; *Schaefer*, 124 S.W.3d at 162.

Kelley also cites to *Pichel v. Dryden Mutual Insurance Co.*, 965 N.Y.S.2d 342 (N.Y. Sup. Ct. 2013), *aff'd*, 986 N.Y.S.2d 268 (N.Y. App. Div. 2014); *Junius Development Inc. v. New York Marine & General Insurance Co.*, 852 N.Y.S.2d 185 (N.Y. App. Div. 2008); *Old Dominion Insurance Co. v. Elysee, Inc.*, 601 So. 2d 1243 (Fla. Dist. Ct. App. 1992); *Hallsted v. Blue Mountain Convalescent Center, Inc.*, 595 P.2d 574 (Wash. Ct. App. 1979). However, Kelley does not explain how these cases support its assertion that "case law supports a construction that distinguishes between an overflow from a municipal water or sewer system, which is covered by similar exclusions, and an overflow from the insured's own holding tanks or septic system caused by an accident occurring within the insured's plumbing system, which is not covered by the exclusion." Relatedly, Kelley also fails to address whether these cited cases involved the same policy coverage and exclusion provisions that are at issue in the case before us.

Finally, we address Kelley's argument that the Water Exclusion Endorsement is inapplicable here because the term "'drain' as used in the exclusion cannot reasonably be interpreted to include the 'floor drains' in this case." Kelley argues that "'floor drains,' as used in the testimony given in this case, refers to the holes in the floor through which excess water is removed from bathrooms in the Building. . . . 'Floor drains' does not refer to the pipe used to remove the water from the Building

to a treatment facility or a body of water."

The "testimony" Kelley refers to is the affidavit of Kelley's President Duane H. Kamins. Kamins stated in his affidavit, "On October 2, 2012, Kelley Street suffered a loss due to a failure of the plumbing system in the Kelley Street Building. Specifically, on the evening of October 2[,] water began to flow through a series of floor drains in the building most but not all of which were located in bathrooms."

It is unclear how this statement supports Kelley's argument that the term "drain" does not include floor drains. Further, Kelley does not cite any authority to support its contention that the term "drain" does not include floor drains because "'[f]loor drains' does not refer to the pipe used to remove the water from the Building to a treatment facility or a body of water." Nor does Kelley cite any authority that the term "drain" refers solely to "the pipe used to remove the water from the Building to a treatment facility or a body of water."

The policy does not define the term "drain" and does not impose any limitations on that term. "Drain" is commonly defined as a "conduit for draining liquid, as a ditch or a pipe," *Drain*, BLACK'S LAW DICTIONARY (10th ed. 2014), or as "a channel or pipe carrying off surplus liquid, esp. rainwater or liquid waste," *Drain*, NEW OXFORD AMERICAN DICTIONARY (3rd ed. 2010). We conclude that the term "drain" as commonly defined encompasses a floor drain because a floor drain is a conduit for draining liquid or carrying off surplus liquids. Nothing in these definitions would support Kelley's proposed narrow reading of the term "drain" as being a "pipe used to remove the water from the Building to a treatment facility or a body of water." Having determined that the term "drain" encompasses floor drains, we need not address whether the term "sewer" also encompasses a septic system; the Water Exclusion Endorsement excludes loss or damage caused by water that backs up or overflows or is otherwise discharged from a sewer *or* drain.

We conclude the policy unambiguously excludes from coverage the type of loss Kelley experienced.  Accordingly, we overrule Kelley's sole issue on appeal.

## CONCLUSION

Having overruled Kelley's sole issue, we affirm the trial court's judgment.

/s/    William J. Boyce
Justice

Panel consists of Justices Boyce, McCally and Donovan.